AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )     Case No. 21-8334 MB |
| 8370 & 8380 S. Kyrene Road | ) |
| Tempe, Arizona 85284 | ) |
| | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

      An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Arizona
*(identify the person or describe the property to be searched and give its location)*:
  See Attachment A

      I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
  See Attachment B

      **YOU ARE COMMANDED** to execute this warrant on or before    12-16-21    *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

      Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

      The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to      the duty magistrate judge in the Phoenix Division    .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
      ☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  12-2-21 @ 1:49 p.m.          *Judge's signature*

City and state:  Phoenix, Arizona               • Hon. John Z. Boyle, U.S. Magistrate Judge
                                                          *Printed name and title*

## ATTACHMENT A

## DESCRIPTION OF THE PREMISES TO BE SEARCHED

The premises to be searched are located at buildings 8370 (suites 105 and 107) and 8380 (suites 109 and 110) located off South Kyrene Road, Tempe, AZ 85284, including warehouse space, laboratory, and office structures within and any outbuildings.  The two buildings are believed to be single-story structures adjacent to one another divided by a parking lot.  The buildings are also believed to be contained within an office park.



The image above shows building 8370; suite 107 is to the right and suite 105 is to the left.

1



The image above shows building 8380, suite 110 is to the right and suite 109 is to the left.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.     The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 545 (smuggling); 21 U.S.C. § 331(a) (introducing a misbranded drug into interstate commerce); 21 U.S.C. § 331(d) (introducing an unapproved new drug into interstate commerce); 18 U.S.C. § 1001 (false statements); and 18 U.S.C. § 371 (related conspiracies) (collectively, the "Subject Offenses"), namely:

     a.     All documents related to the introduction into interstate commerce of any unapproved new drugs and/or misbranded drugs intended for use as nootropics, including numerous racetam drugs, phenibut, adrafinil, and tianeptine (collectively, the "Unapproved Drugs"), originating either from a foreign location or from within the United States, from 2017 to the present. Such documents include correspondence relating to or referencing the importation and/or sale of drugs (in hard copy or electronic format); ledgers; records of receipt, sale, or distribution of drugs including airway bills, packing slips, and records reflecting the contents of any such packages; customer lists; pay-owe sheets;

     b.     All documents reflecting or relating to the transmission of funds, both foreign and domestic, from 2017 to the present, including wire transfer sheets, Western Union/Money Gram receipts, money orders, and any other methods of remitting money, as related to the Subject Offenses;

     c.     Other items evidencing the obtainment, concealment, transfer or expenditure of money (United States currency, crypto currency or foreign currency) relating to the Subject Offenses from 2017 to the present, whether kept manually and/or by mechanical, and/or electronic devices pertaining to the wiring and/or receipt of funds;

     d.     All financial books and records from 2017 to the present relating to the Subject Offenses, including ledgers, journals, loan records, financial statements, tax returns, books and work papers, bills and investment accounts, and all financial transactions;

     e.     Bank and investment account records from 2017 to the present relating to the Subject Offenses, both foreign and domestic, including deposits, withdrawals, personal checks, business checks, receipts, money orders, cashier checks, official bank checks, money drafts, certificates of deposits, money market certificates, stocks, bonds, bearer bonds and statements;

1

f.      Credit card records from 2017 to the present relating to the Subject Offenses, which include correspondence, monthly billing statements, individual charge invoices, repayment records;

g.      All records relating to the processing of credit cards from 2017 to the present, including merchant statements, chargeback documents, including correspondence from the cardholder, correspondence from/to the merchant, and all credit card access devices, as related to the Subject Offenses;

h.      Federal and State Tax Returns and Tax Records relating to the Subject Offenses, including personal income tax returns, corporate tax returns, employment tax returns, sales tax returns, and property tax returns;

i.      All Unapproved Drugs listed above including racetam drugs, phenibut, adrafinil and tianeptine, raw materials or components used to manufacture the Unapproved Drugs, and any labeling or packaging material for the Unapproved Drugs;

j.      Diaries, daily planners, calendars, and notes relating to the Subject Offenses;

k.      Travel records relating to the Subject Offenses, to include books, records, receipts, notes, ledgers, airline tickets, vehicle rental receipts, credit card receipts and bills, hotel receipts, meal receipts, travel agency vouchers, travel schedules and other travel-related papers;

l.      Safe deposit keys, keys for self-storage facilities, contracts for safe deposit box rentals, access records, and records of rental fees paid relating to the Subject Offenses disclosing the date, amount and method of payment;

m.      Records and notes relating to the purchase of real property from 2017 to the present, domestic or foreign, deeds, mortgages, leases, trusts and escrow accounts as related to the Subject Offenses;

n.      Records relating to the rental of U.S. Post Office Boxes including applications, PO Box keys, and receipts documenting payment/control of the boxes, as related to the Subject Offenses;

o.      Copies or photographs of records of personal identification relating to the Subject Offenses, such as a driver's license, passports, and/or social security cards, that contain information which tends to establish ownership/control over the premises to be searched;

p.      Correspondence with co-conspirators relating to the Subject Offenses including drop-shippers or websites selling illicit drugs; records of

registration of website or domain names;

q. Photographs, negatives, video tapes, and films relating to the Subject Offenses, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting illegal drugs);

r. Address books reflecting names, addresses and telephone numbers of persons relating to the Subject Offenses;

s. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof;

t. Import and export records and correspondence with Customs and Border Protection ("CBP") regarding raw materials or compounds used to manufacture the Unapproved Drugs;

u. All documents related to certificates of intent provided to CBP;

v. Records of research and development and laboratory analyses regarding raw materials or compounds used to manufacture the Unapproved Drugs;

w. Correspondence and communications to and from the FDA regarding the sale, labeling, import, or export of the Unapproved Drugs;

x. Evidence of correspondence and communications related to consumer questions, complaints, or reviews regarding the Unapproved Drugs;

y. With respect to any digital device containing evidence of the Subject Offenses falling within the scope of the foregoing categories of items to be seized:

    i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3

iii.    evidence of the attachment of other devices;

iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.    passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Arizona

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>8370 & 8380 S. Kyrene Road<br>Tempe, Arizona 85284 | )<br>)<br>)<br>)<br>)<br>) | Case No.  21-8334 MB |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ District of _____ Arizona _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

□ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 545, 21 USC 331(a) &<br>(b), 18 USC 1001, 18 USC 371 | Smuggling, introducing a misbranded/unapproved drug into interstate commerce,<br>false statements, conspiracy |

The application is based on these facts:

See Affidavit

□ Continued on the attached sheet.

□ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA James R. Knapp _____

_____
*Applicant's signature*

William Hughes, FDA-OCI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date:  12-2-21 @ 1:49 p.m.

_____
*Judge's signature*

City and state:  Phoenix, Arizona

Hon. John Z. Boyle, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

## DESCRIPTION OF THE PREMISES TO BE SEARCHED

The premises to be searched are located at buildings 8370 (suites 105 and 107) and

8380 (suites 109 and 110) located off South Kyrene Road, Tempe, AZ 85284, including

warehouse space, laboratory, and office structures within and any outbuildings.  The two

buildings are believed to be single-story structures adjacent to one another divided by a

parking lot.  The buildings are also believed to be contained within an office park.



The image above shows building 8370; suite 107 is to the right and suite 105 is to

the left.

1



The image above shows building 8380, suite 110 is to the right and suite 109 is to the left.

## ATTACHMENT B

### ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 545 (smuggling); 21 U.S.C. § 331(a) (introducing a misbranded drug into interstate commerce); 21 U.S.C. § 331(d) (introducing an unapproved new drug into interstate commerce); 18 U.S.C. § 1001 (false statements); and 18 U.S.C. § 371 (related conspiracies) (collectively, the "Subject Offenses"), namely:

   a.   All documents related to the introduction into interstate commerce of any unapproved new drugs and/or misbranded drugs intended for use as nootropics, including numerous racetam drugs, phenibut, adrafinil, and tianeptine (collectively, the "Unapproved Drugs"), originating either from a foreign location or from within the United States, from 2017 to the present. Such documents include correspondence relating to or referencing the importation and/or sale of drugs (in hard copy or electronic format); ledgers; records of receipt, sale, or distribution of drugs including airway bills, packing slips, and records reflecting the contents of any such packages; customer lists; pay-owe sheets;

   b.   All documents reflecting or relating to the transmission of funds, both foreign and domestic, from 2017 to the present, including wire transfer sheets, Western Union/Money Gram receipts, money orders, and any other methods of remitting money, as related to the Subject Offenses;

   c.   Other items evidencing the obtainment, concealment, transfer or expenditure of money (United States currency, crypto currency or foreign currency) relating to the Subject Offenses from 2017 to the present, whether kept manually and/or by mechanical, and/or electronic devices pertaining to the wiring and/or receipt of funds;

   d.   All financial books and records from 2017 to the present relating to the Subject Offenses, including ledgers, journals, loan records, financial statements, tax returns, books and work papers, bills and investment accounts, and all financial transactions;

   e.   Bank and investment account records from 2017 to the present relating to the Subject Offenses, both foreign and domestic, including deposits, withdrawals, personal checks, business checks, receipts, money orders, cashier checks, official bank checks, money drafts, certificates of deposits, money market certificates, stocks, bonds, bearer bonds and statements;

1

f.  Credit card records from 2017 to the present relating to the Subject
Offenses, which include correspondence, monthly billing statements,
individual charge invoices, repayment records;

g.  All records relating to the processing of credit cards from 2017 to the
present, including merchant statements, chargeback documents, including
correspondence from the cardholder, correspondence from/to the merchant,
and all credit card access devices, as related to the Subject Offenses;

h.  Federal and State Tax Returns and Tax Records relating to the Subject
Offenses, including personal income tax returns, corporate tax returns,
employment tax returns, sales tax returns, and property tax returns;

i.  All Unapproved Drugs listed above including racetam drugs, phenibut,
adrafinil and tianeptine, raw materials or components used to manufacture
the Unapproved Drugs, and any labeling or packaging material for the
Unapproved Drugs;

j.  Diaries, daily planners, calendars, and notes relating to the Subject
Offenses;

k.  Travel records relating to the Subject Offenses, to include books, records,
receipts, notes, ledgers, airline tickets, vehicle rental receipts, credit card
receipts and bills, hotel receipts, meal receipts, travel agency vouchers,
travel schedules and other travel-related papers;

l.  Safe deposit keys, keys for self-storage facilities, contracts for safe deposit
box rentals, access records, and records of rental fees paid relating to the
Subject Offenses disclosing the date, amount and method of payment;

m.  Records and notes relating to the purchase of real property from 2017 to the
present, domestic or foreign, deeds, mortgages, leases, trusts and escrow
accounts as related to the Subject Offenses;

n.  Records relating to the rental of U.S. Post Office Boxes including
applications, PO Box keys, and receipts documenting payment/control of
the boxes, as related to the Subject Offenses;

o.  Copies or photographs of records of personal identification relating to the
Subject Offenses, such as a driver's license, passports, and/or social
security cards, that contain information which tends to establish
ownership/control over the premises to be searched;

p.  Correspondence with co-conspirators relating to the Subject Offenses
including drop-shippers or websites selling illicit drugs; records of

2

registration of website or domain names;

q.    Photographs, negatives, video tapes, and films relating to the Subject Offenses, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting illegal drugs);

r.    Address books reflecting names, addresses and telephone numbers of persons relating to the Subject Offenses;

s.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof;

t.    Import and export records and correspondence with Customs and Border Protection ("CBP") regarding raw materials or compounds used to manufacture the Unapproved Drugs;

u.    All documents related to certificates of intent provided to CBP;

v.    Records of research and development and laboratory analyses regarding raw materials or compounds used to manufacture the Unapproved Drugs;

w.    Correspondence and communications to and from the FDA regarding the sale, labeling, import, or export of the Unapproved Drugs;

x.    Evidence of correspondence and communications related to consumer questions, complaints, or reviews regarding the Unapproved Drugs;

y.    With respect to any digital device containing evidence of the Subject Offenses falling within the scope of the foregoing categories of items to be seized:

      i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3

iii.    evidence of the attachment of other devices;

iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.    passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

4

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT**

I, William Hughes, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the
Federal Rules of Criminal Procedure for a warrant to search buildings 8370 (suites 105
and 107) and 8380, (suites 109 and 110) located off South Kyrene Road, Tempe Arizona,
(the "Subject Premises"), which are occupied by the company Centera Bioscience
Inc./Nootropicsdepot.com (the "Target Business") and its subsidiaries, including
Supplement Logistics, as described more fully in Attachment A.

2.      I am employed by the United States Food and Drug Administration, Office
of Criminal Investigations (FDA-OCI) and have served as an FDA-OCI Special Agent
for the past nine years.  I am assigned to the Boston Resident Office, whose geographic
jurisdiction includes the District of New Hampshire.  I am responsible for investigating
violations of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.,* and
other federal statutes enforced by FDA, and am authorized to conduct investigations,
make arrests, and execute search and arrest warrants for these offenses.  I was previously
a Special Agent with the Criminal Investigation Command, United States Army, for over
eleven years.  I have received training in criminal investigative techniques throughout my
law enforcement career and have completed courses including the FDA-OCI Special
Agent Training Program at the Federal Law Enforcement Training Center and the United
States Army Criminal Investigations Special Agent Training Course.  I graduated from
Campbell University in North Carolina with a degree in Criminal Justice.

1

3.     The facts in this affidavit are based upon my personal observations, my training and experience, and information obtained from law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is probable cause for the requested search warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

4.     As set forth below, there is probable cause to believe that evidence, fruits, or instrumentalities of the following criminal offenses, as described more fully in Attachment B, will be found in the Subject Premises: 18 U.S.C. § 545 (smuggling); 21 U.S.C. § 331(a) (introducing a misbranded drug into interstate commerce); 21 U.S.C. § 331(d) (introducing an unapproved new drug into interstate commerce); 18 U.S.C. § 1001 (false statements); and 18 U.S.C. § 371 (related conspiracies) (collectively, the "Subject Offenses").

## LEGAL BACKGROUND

5.     The United States Food and Drug Administration (FDA) is a federal agency responsible for protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act (FDCA).  One purpose of the FDCA is to ensure that drugs sold for use in humans are safe and effective for their intended uses.

6.     Whether a product is a "drug" under the FDCA depends on its intended use. 21 U.S.C. § 321(g)(1).  Drugs are defined as, among other things: (1) "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man," 21 U.S.C. § 321(g)(1)(B); (2) "articles (other than food) intended to affect the structure or

2

any function of the body of man," 21 U.S.C. § 321(g)(1)(C); and (3) "articles intended for use as a component of" other drugs, 21 U.S.C. § 321(g)(1)(D).

7.     Intended use refers "to the objective intent of the persons legally responsible for the labeling of [drugs] (or their representatives). The intent may be shown by such persons' expressions, the design or composition of the [drugs], or by the circumstances surrounding the distribution of the [drugs]. This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives." 21 C.F.R. § 201.128.

8.     Under the FDCA, the term "new drug" generally includes any drug that is not generally recognized among qualified experts "as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling" of the drug. 21 U.S.C. § 321(p)(1). To be generally recognized as safe and effective, a drug must have been subjected to adequate and well-controlled clinical investigations that establish that the drug is safe and effective. In addition, those investigations must have been published in the scientific literature available to qualified experts, and experts must generally agree, based on those published studies, that the product is safe and effective for its intended uses.

9.     The FDCA defines "label" as "a display of written, printed, or graphic matter upon the immediate container of any article," 21 U.S.C. § 321(k), and "labeling" as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article," 21 U.S.C. § 321(m).

3

10.     With limited exceptions not applicable here, unless the FDA has approved a

new drug application or an abbreviated new drug application for a drug, the drug is an

"unapproved new drug" and cannot lawfully be introduced or delivered for introduction

into interstate commerce. [1] 21 U.S.C. § 355(a).  Under 21 U.S.C. § 331(d), it is illegal to

introduce, or deliver for introduction, into interstate commerce any unapproved new drug,

or to cause the introduction or delivery for introduction into interstate commerce of any

unapproved new drug.

11.     A drug is misbranded under the FDCA if its labeling fails to bear "adequate

directions for use."  21 U.S.C. § 352(f)(1).  "Adequate directions for use" mean

directions under which a layman can use a drug safely for the purposes for which it is

intended.  21 C.F.R. § 201.5.  A drug is misbranded under this provision if it fails to

include, among other things, instructions concerning the quantity and frequency of

dosage for each intended use.  *Id.*

12.     Every person who owns or operates an establishment in any State engaged

in the manufacture or repackaging of a drug is required to register annually with the

FDA.  21 U.S.C. § 360.  A drug is misbranded if it was manufactured in an establishment

not registered with FDA.  21 U.S.C. § 352(o).

---

[1] Under some circumstances, products intended to affect the structure or function of the body of persons can be regulated as dietary supplements, not drugs.  To be considered a dietary supplement, a product must, among other things, be labeled as a dietary supplement.  21 U.S.C. § 321(ff)(2)(C).  None of the products mentioned in this affidavit are labeled as or otherwise represented to be dietary supplements.

13.     Under 21 U.S.C. § 331(a), it is illegal to introduce or deliver for introduction into interstate commerce any misbranded drug or to cause the introduction or delivery for introduction into interstate commerce of any misbranded drug.

14.     A person who violates 21 U.S.C. § 331(a) or (d) "shall be imprisoned for not more than one year . . ." 21 U.S.C. § 333(a)(1).  A person who violates Section 331 "with the intent to defraud or mislead" "shall be imprisoned for not more than three years . . ." 21 U.S.C. § 333(a)(2).  A person who violates 21 U.S.C. § 331(a) or (d) may also be subject to applicable fines under 18 U.S.C. § 3571.

## PROBABLE CAUSE

### Background on Nootropicsdepot.com

15.     This investigation began in April 2017, after the FDA's Office of Criminal Investigations (FDA-OCI) identified and reviewed the website Nootropicsdepot.com. FDA-OCI observed that the website offered for sale numerous unapproved new drugs intended for use as nootropics, including numerous racetam drugs, phenibut, adrafinil, and tianeptine (collectively, the "Unapproved Drugs").  The term "nootropic" refers to substances intended to enhance memory or otherwise improve cognitive function.

16.     The racetam drugs offered for sale on Nootropicsdepot.com include piracetam, aniracetam, coluracetam, fasoracetam, oxiracetam, pramiracetam, and phenylpiracetam.  Nootropicsdepot.com also offers phenibut and adrafinil for sale in powder and capsule form.

17.     The racetam, phenibut, and adrafinil products offered for sale on Nootropicsdepot.com are represented on the website as "nootropic compounds."

5

Products referred to as nootropics or nootropic compounds are intended to affect the structure or function of the body of persons and generally are considered drugs under the FDCA.

18.     FDA has not approved any of the racetam drugs, phenibut, or adrafinil as a drug for any intended use.

19.     On November 29, 2021, I reviewed the Nootropicsdepot.com website and confirmed that the unapproved racetam drugs, phenibut, and adrafinil are still offered for sale through the Nootropicdepot.com website.

20.     Previously, Nootropicsdepot.com offered tianeptine for sale as a nootropic compound.  The FDA has not approved tianeptine as a drug for any intended use.  The FDA has warned of serious adverse effects associated with the use of tianeptine as a drug, including a risk of addiction.  Although tianeptine is no longer offered for sale directly through the Nootropicsdepot.com website, Nootropics Depot-brand tianeptine is still offered for purchase by customers in the United States through a Mexican website.

21.     Based on my training and experience, with few exceptions not applicable here, almost all drugs, including the Unapproved Drugs, are new drugs.  Further, I am not aware of any published adequate and well-controlled clinical studies establishing that the Unapproved Drugs manufactured and/or distributed by Nootropicsdepot.com are safe and effective for their intended uses.  In addition, my review of open-source information about these drugs, and other drugs containing the same active ingredients, indicates there is no general consensus among qualified experts that the Unapproved Drugs are safe and effective for the intended uses.  Therefore, there is probable cause to believe that the

Unapproved Drugs manufactured and/or distributed by Nootropicsdepot.com are
unapproved new drugs.

## Advertising Practices of Nootropics Depot

22.     As of August 11, 2021, Nootropics Depot has paid over four million dollars
to advertise its drugs on Google and Facebook.  As a result, as of November 8, 2021,
searches on Google for "nootropics" and the drugs "phenibut" and "piracetam" return
with Nootropicsdepot.com as the first advertised search result.  The search results
included photos and prices of Nootropicsdepot.com products.  Nowhere on the
advertisement does it state the drugs are for research purposes only.

## Arizona and Nevada Corporate Information

23.     Paul Eftang is the President and owner of Centera Bioscience, Inc.  Centera
is the parent company of several companies, including Nootropics Depot, Ceretropic,
Natrium Health, and Supplement Logistics.

24.     According to the Arizona Corporation Commission's business search
website, Nootropics Depot LLC was established as a Foreign Limited Liability Company
on April 19, 2017.  The statutory agent was listed as Centera Bioscience Inc., 8380 S.
Kyrene Road, Ste 110, Tempe, AZ, 85284.  The document was signed by Paul Eftang.

25.     According to the Nevada Secretary of State's business search website,
Nootropics Depot LLC was originally established on June 1, 2015, in Nevada, under the
Non-Commercial Registered Agent Richard Lamotee, 39 Belle Soliel Avenue, Las
Vegas, NV, 89123.  Through grand jury documents and witness interviews it is believed
Lamotee is currently employed by Nootropics Depot.  Furthermore, Centera Bioscience

Inc. was listed as the Manager under the Officer Information section of the Nevada website, which was last updated on May 28, 2019.

26.     According to the Articles of Incorporation document found within the Arizona Corporation Commission website, Centera Bioscience Inc. was established on July 8, 2015, as a Supplier of Nootropics Products for Personal and Research Use.  The business address listed was 8380 S Kyrene Road #110, Tempe, AZ 85284, and Paul Eftang was listed as the CEO and President.

27.     According to the 2021 Annual Report as documented by the Arizona Corporation Commission, Centera Bioscience Inc., is a domestic for-profit retail sales business, with a physical address of 8380 S. Kyrene Road, #110, Tempe, AZ 85284. Paul Eftang was listed as the Director, President, and CEO.

## LegitScript

28.     LegitScript is an organization specializing in online internet pharmacy verification, customized platform sweeps, threat assessments, investigative reports, and online pharmacy certification approval by the U.S. National Association of Boards of Pharmacy.  LegitScript often assists FDA-OCI in internet-based investigations.  In May 2017, LegitScript provided an Initial Information Request Report (the "IRR") in response to an FDA-OCI request for information on the domain name Notropicsdepot.com.  Since then, FDA-OCI has received several updated IRRs for Nootropicsdepot.com, most recently in February 2021.  A review of the IRRs revealed Eftang took control of Nootropicsdepot.com in 2015.  Other active businesses associated with Eftang are Centera Bioscience, Inc., Centera Holdings, LLC, Ceretropic Ltd., Nootropics Depot,

Ltd., and Nootropics Depot, LLC. Nootropicsdepot.com was registered through the

Arizona-based registrar GoDaddy.com LLC and appears to utilize Google-controlled

mail servers.

29.     According to Nootropicsdepot.com, its products are manufactured in an

industrial park—specifically, Buildings 8370 and 8380 located off S. Kyrene Road,

Tempe, AZ 85284. Nootropicsdepot.com primarily markets "nootropic compounds" and

dietary supplements and targets a U.S. consumer base, although it does offer international

shipping.

30.     The website Nootropicsdepot.com has an extensive social media presence,

especially on Reddit. Law enforcement believes that Eftang posts under the username

"MisterYouAreSoDumb" because that user claimed to own Ceretropic and said on

September 15, 2015, "I own the brand, and it is my team running operations. I am still

friends with Matt and everyone up at Parmatrix/Hard Rhino, and we will continue to help

each other out with whatever we can. However, everything to do with the Nootropics

Depot brand is now under my control, and in the hands of my capable team." "Matt"

likely refers to Matt Harrier, who is a current Nootropics Depot employee. "Hard Rhino"

was another website that offered products similar to those offered by

Nootropicsdepot.com.



31.    LegitScript identified additional websites affiliated with Eftang and

Nootropics Depot products.  Two of these, cuerpoymente.mx and cymnootropics.com,

are operated by Maxime Oujevolk.  Oujevolk is a French citizen living in Mexico City,

Mexico.  Although both websites are separate entities from Eftang's businesses, they sell

Ceretropic and Nootropics Depot products.  The bottom of the homepage of

cuerpoymente.mx (as shown below) states the website is an official distributor of

Nootropics Depot, Natrium Health, and Ceretropic products, which are manufactured at a

Phoenix, AZ laboratory.



32.     After a review of comments related to Cuerpoymente.mx and Nootropicsdepot.com within Reddit forums, it is believed Oujevolk uses the Reddit username "baronjpetor."  In an August 2020 Reddit post, Oujevolk stated "Ceretropic wasn't sold but when /u/misteryouaresodumb stopped the US operations in 2018 he gave his green light to let us sell Ceretropic products in Mexico, Colombia and Dominican Republic.  All the Ceretropic products we sell are supplied and tested by Nootropicsdepot's team."



33.     Based on several comments posted by Eftang on the same Reddit thread, Ceretropic shipping was initially restricted to Latin American countries, but this restriction was no longer in place.  Eftang stated he lifted the shipping restriction because he wanted "enough time to pass between our shutdown and anything that could rock the boat."



34.     In November 2020, Oujevolk posted on the Cuerpoymente subreddit page that cuerpoymente.mx was expanding its shipping and would be utilizing "America Ship," a U.S.-based company located at the U.S.-Mexican border, as a re-shipper. The packages would be inspected by U.S. customs at America Ship before reaching U.S.-based consumers.



35.     In a January 2021 Reddit post, Oujevolk stated he was opening a new Cuerpoymente website (cymnootropics.com), which would be in English. According to the website's "about us" page, it was the sister website of cuerpoymente.mx, and would market Ceretropic products produced by Nootropics Depot.

12



Cymnootropics.com is the sister website of Cuerpoymente.mx, the #1 peptides and nootropics online store in Mexico.

We are the exclusive distributor of Ceretropic products in Mexico and we ship internationally.

Ceretropic stopped its activities in the US in 2018, but since then they have kept supplying us with their products (peptides, nootropics, SARMs and other research compounds).

All the Ceretropic products we sell are thoroughly analyzed in the Nootropics Depot's laboratory in Tempe (AZ) and in an independent third party lab.

Although both websites are based in Mexico, they target U.S. consumers.

36.     A third website believed to be operated by Oujevolk is ceretropic.co and is based in Colombia.  This website does not offer shipping to other countries but is significant to this investigation because of a Reddit post authored by Eftang, wherein Eftang stated the website was a legitimate distributor of Ceretropic products produced in the U.S.

37.     Eftang continues to post on Reddit using the username MisterYouAreSoDumb on Nootropic topics, dosing, and NootropicDepot.com customer inquiries.



MisterYouAreSoDumb  Natrium Health & Nootropics Depot  1 year ago
We still produce all Ceretropic products at our facility in the United States. All of our current distributors are in Latin America at the moment.

↑ 3 ↓  Share  Report  Save

**Imports**

38.     During the course of this investigation, Customs and Border Protection (CBP) has detained several shipments.  The substances identified in these shipments were

adrafinil, magnesium glycinate, oxiracetam, piracetam, phenibut, and pramiracetam.  For each of these shipments, CBP sent an inquiry to the consignee (either Centera Bioscience or its subsidiary Supplement Logistics) asking for the intended use of the substances. The responses were all signed by Paul A. Sheard, Strategic Director, for both Centera Bioscience and Supplement Logistics, and said that the substances were to be **"used in laboratory analysis, research and development; not for consumption or for diagnostic, therapeutic, or other household uses."**

39.     On September 1, 2021, two additional shipments were detained by CBP and transferred as evidence to FDA-OCI.

40.     The first shipment was twenty (20) barrels of phenibut hydrochloride, with an estimated total weight of 1,111.13 pounds.  The phenibut hydrochloride was shipped from Shanghai Norky Pharmaceutical Co., Ltd., Shanghai, China and destined for Supplement Logistics LLC, 8380 S. Kyrene Road, Suite 100, Tempe, AZ 85284.  A review of the invoice from Shanghai Norky Pharmaceutical revealed the product was listed as 4-Amino-3-phenylbutyric acid hcl (commonly known as phenibut hydrocholoride); however, the product was listed as Aromatic Monoamine on the CBP Form 7501 "Entry Summary" document.

41.     In response to a CBP inquiry as to Supplement Logistics' intended use of the substance, a memorandum was returned stating **"The product contained within will be used in laboratory analysis, research, and development; for industrial use only; not for consumption or for diagnostic, therapeutic, or other household uses."**  This

memorandum was signed by Paul A. Sheard, Strategic Director, Supplement Logistics, LLC.

42.     The second shipment was forty (40) barrels of piracetam, with an estimated total weight of 2,253.12 pounds.  The piracetam was shipped from Shanghai Soyoung Biotechnology Inc, 1500 South Lianhua Road, Minhang Shanghai, 201100, China, and destined for Centera Bioscience LLC, 8380 S. Kyrene Road, Suite 110, Tempe, AZ 85284.



43.     A review of the invoice from Shanghai Soyoung Biotechnology Inc., listed the contents as 2-(2-oxopyrrolidin-1-yl) acetamide (commonly known as piracetam); however, the product was listed as Lactoms:N-Vinyl-2-Pyrrolidone on the CBP Form 7501, "Entry Summary" document.  N-Vinyl-2-Pyrrolidone is a compound different from piracetam and generally unregulated by the FDA.  Had the invoice listed the substance as piracetam, it would have triggered greater scrutiny by CBP and FDA.

44.    In response to a CBP inquiry as to Centera Bioscience's intended use of the substance, a memorandum was returned stating **"The product contained within will be used in laboratory analysis, research, and development; not for consumption or for diagnostic, therapeutic, or other household uses."** This memorandum was signed by Paul A. Sheard, Strategic Director, Centera Bioscience.

45.    On September 14, 2021, another shipment was detained by CBP and transferred as evidence to FDA-OCI.

46.    The third shipment was twenty (20) barrels of phenibut hydrochloride, with an estimated total weight of 1,102.31 pounds. The phenibut hydrochloride was shipped from Qingdao Sincess International Company, LTD, 1-B-1007, 88# Chunyang Road, Qingdao, China and destined for Centera Bioscience LLC, 8380 S. Kyrene Road, Suite 110, Tempe, AZ 85284. A review of the invoice from the Qingdao Sincess listed the product as 4-amino-3-phenylbutyric acid (also commonly known as phenibut); however, the product was listed as Aromatic Monoamine on the CBP Form 7501, "Entry Summary" document.

47.    Products regulated by the FDA are subject to FDA review when they are offered for entry in the U.S. The FDA electronically reviews all FDA-regulated entries submitted through CBP. The importer is responsible for ensuring that imported FDA-regulated products comply with all FDA laws and regulations. Products which do not comply with U.S. requirements at the time of importation are subject to refusal of admission.

48.     After reviewing the Nootropicsdepot.com website and email communication from the undercover buys outlined below, there is no indication Nootropics Depot is selling their products for research purposes.  In my experience, sellers of unapproved or illicit drugs sometimes represent their drugs are not intended for human use or are intended for research purposes only to evade FDA oversight and regulation.  Further, a review of the import documentation associated with the three aforementioned shipments indicates the items were not declared as FDA-regulated products (and thus mislabeled) and appear to be filed in a manner to avoid CBP and FDA scrutiny.

## Undercover Purchase and Email Correspondence

### (Note: emails are verbatim, they include spelling / grammar mistakes)

### FDA-OCI Special Agent (SA) Robert Ekey Undercover Purchases

49.     On May 12, 2017, SA Ekey navigated to the Nootropicsdepot.com website and placed an undercover purchase (UC) of, among other things, the following Unapproved Drugs:

Phenibut HCL Powder, 25 grams

Aniracetam Powder, 30 grams

Coluracetam Sample, .5 grams

Fasoracetam Sample, 1 gram

Phenylpiracetam Powder Sample, 1 gram

Pramiracetam Sample, 3 grams

50.     The products were received on May 15, 2017.  The products were shipped to an undercover mailbox located in Portsmouth, NH via the United States Postal Service (USPS) from Order Fulfillment, Nootropics Depot, 8380 S. Kyrene Road, Ste 109, Tempe, AZ 85284.

51.     On May 19, 2017, SA Ekey navigated to the Nootropicsdepot.com website and conducted an undercover purchase of the Unapproved Drugs tianeptine sulfate (10 grams) and fasoracetam powder (5 grams).  The products were received on May 30, 2017, to the same undercover mailbox located in Portsmouth, NH via USPS from Order Fulfillment, Nootropics Depot, 8380 S. Kyrene Road, Ste 109, Tempe, AZ 85284.

52.     On November 28, 2017, SA Ekey navigated to the Nootropicsdepot.com website and conducted an undercover purchase of the Unapproved Drugs aniracetam powder, coluracetam capsules, fasoracetam powder, phenibut HCL powder, phenylpiracetam powder, pramiracetam powder, and tianeptine sulfate powder.  The products were received on November 30, 2017, to the same undercover mailbox located in Portsmouth, NH via USPS from Order Fulfillment, Nootropics Depot, 8380 S. Kyrene Road, Ste 109, Tempe, AZ 85284.

53.     On March 26, 2019, SA Ekey navigated to the Nootropicsdepot.com website and conducted an undercover purchase of the Unapproved Drugs aniracetam, phenibut HCL, pramiracetam, phenylpiracetam, coluracetam, and fasoracetam.  The products were received on April 5, 2019, to the same undercover mailbox located in Portsmouth, NH via USPS from Order Fulfillment, Nootropics Depot, 8380 S. Kyrene Road, Ste 109, Tempe, AZ 85284.

18

54.     On February 7, 2020, SA Ekey navigated to the Nootropicsdepot.com

website and conducted an undercover purchase of the Unapproved Drugs aniracetam,

phenibut HCL, piracetam, phenylpiracetam, coluracetam, and fasoracetam.  The products

were received on February 20, 2020, to the same undercover mailbox located in

Portsmouth, NH via USPS from Order Fulfillment, Nootropics Depot, 8380 S. Kyrene

Road, Ste 109, Tempe, AZ 85284.

55.     The labels of all these products contain (1) the name of the chemical

contained therein, i.e., phenibut, (2) the phrase "Nootropic Compound," and (3) a

disclaimer reading "All chemical compounds have risks.  Please read the available

research and understand the associated risks before handling.  If you are uncertain of the

appropriate handling methods, please consult a qualified professional.  Misuse of the

product may result in adverse reactions.  This product is not approved by the FDA."  The

labels do not include any directions for use, such as the intended use, dosage information,

or the route or method of administration.  The drugs are therefore misbranded because

their labeling does not include adequate directions for use as required by the FDCA.  In

addition, because these drugs are not generally recognized as safe and effective for their

intended uses (that is, nootropics intended to affect the structure and function of the

human body), and are not approved by the FDA, they are also unapproved new drugs.

**FDA-OCI Special Agent William Hughes' Undercover Purchases and Emails**

56.     On January 25, 2021, I utilized an undercover email address to email

ceretropic.mx at their contact email address contacto@ceretropic.mx.  I sent the

following email: "Hi, do you ship to the states?"  The email response from

19

contacto@ceretropic.mx was: "Hey Bill We do ship to the states via our truster & er at the Mexico/US border.  We recommend using our main website Cuerpoymente.mx/tienda instead of Ceretropic.mx which has not been updated in a while.  Please let me know if you have any questions.  Cheers.  Max Cuerpoymente.mx."

57.     This same day I wrote back stating "That's great news, thank you.  I will head to the site and take a look.  Are the products the same quality as ones from the main depot or are these different?"  The reply from contacto@ceretropic.mx was "Hey Bill, The products are the exact same quality as on nootropicsdepot.com (they are the same products)  All our Ceretropic products are also produced by nootropicsdepot and undergo all the required purity/authenticity lab tests.  Best regards.  Max Cuerpoymente.mx."

58.     On February 23, 2021, I utilized an undercover email address to email support@nootropicsdepot.com stating the following: "Hi, does nootropicsdepot still carry tianeptine?  I'm pretty sure I bought some from you guys in the past.  Thanks Bill."  Later the same day, I received a response from support@nootropicsdepot.com stating: "Hello Bill, Thank you for reaching out to our Customer Support team.  I am sorry to inform you that Nootropics Depot no longer carries Tianeptine Sulfate.  If you have any additional questions, please feel free to reach back out to our team.  Thank You, Markayla."

59.     On March 8, 2021, I utilized an undercover email address to email support@nootropicsdepot.com stating: "Hi, are the products on cuerpoymente.mx nootropicdepot products?  I reached out to the website support and they said they were, just wanted to confirm before I spend money, I know your stuff is tested."  Later this same day, I received a response email from support@nootropicsdepot.com stating: "Hi

20

Bill, The Nootropics Depot products sold by cuerpoymente.mx are the products we supply to them, correct.  If you have any other questions, please just let us know.  Thank You, Jaclyn."

60.     On March 10, 2021, I navigated to the cuerpoymente.mx website and registered with the website under username "nootlover17."  I then placed an undercover order for the following Unapproved Drugs: Nootropics Depot phenibut capsules, 180 count and Nootropics Depot tianeptine sodium capsules, 90 count.  The payment was made through Zelle.  The shipping address was Post Office Box 802, Salem, NH, 03079.

61.     Also on March 10, 2021, I received an email at an undercover email address from contacto@cuerpoymente.mx confirming the purchase with the order number 47692.  Later the same day, a second email was received from ventas@cuerpoymente.mx to the undercover email address stating: "Hey William, Payment received, thanks.  We'll ship your order today.  Just an important note regarding your delivery address: It looks like it is a PO box.  We can't ship by Fedex to a PO box and we have to use USPS.  USPS service has been really bad for us ultimately (lots of large delays.).  I would recommend switching to a personal address if this is possible for you.  If you prefer to stick with the post office address, this is not an issue for us, but it's possible that it will take a long time for your order to be delivered.  Please let me know how you'd like us to proceed.  In case you don't answer this email, we will ship by USPS to the address you provided.  Thanks, Max, Cuerpoymente.mx."  I responded with "Hi, I live in the sticks, so no home delivery.  My PO box is it, don't mind the longer wait.  Thanks," to which ventas@cuerpoymente.mx responded with "Understood, thank you!"

21

62.     On March 16, 2021, I emailed ventas@cuerpoymente.mx utilizing an undercover email address asking: "Hi, just checking on my order it's [Order # 47692] (March 10, 2021) can I get a tracking number?" Later this same day, ventas@cuerpoymente.mx replied stating: "Hey Bill, your package is currently undergoing customs clearance. We will send your intra-US tracking number when the process is over (in a few days). Please let me know if you have any questions. Best regards, Max Cuerpoymente.mx."

63.     On March 17, 2021, I received an email from ventas@cuerpoymente.mx stating "Hey William, your order was shipped yesterday from America-Ship's warehouse. Your USPS tracking number is 9505515464731076394477. Please let me know if you have any doubts/questions, Best regards, Natalia Cuerpoymente.mx." On March 26, 2021, this purchase was delivered to the undercover address, PO Box 802, Salem, NH, 03079 and contained all the products ordered. The shipping label indicated the sender as Jenni Castillo, 24280 Resaca Media Drive, San Benito, TX 78586. Castillo appears to have no connection to America Ships, the reported authorized re-shipper/importer.

64.     On March 17, 2021, I navigated to the cymnootropics.com website and registered with the website under an undercover username with an undercover email address. I then placed an undercover order for 10 grams of the Unapproved Drug Nootropics Depot tianeptine sulfate. The shipping address was Eric James, PO Box 4767, Manchester, NH 03108. The order was paid for via bank transfer, transfer number 20210323-00002971.

22

65.     On April 11, 2021, I received an email from support@cymnootropics.com to an undercover email address stating "Hey Eric Your order was shipped yesterday from America-Ship's warehouse.  Your USPS tracking number is 9405 5036 9930 0343 0876 37.  Please let me know if you have any doubts/questions, Best regards, Natalia Cuerpoymente.mx."  On April 16, 2021, this purchase was delivered to the undercover address, PO Box 4767, Manchester, NH 03108.  A return address on the package was labeled Jennifer Castillo, 24280 Resaca Media Drive, San Benito, TX.  Castillo utilized her Click-N-Ship account to mail this package.  Castillo's Click-N-Ship is registered as a personal account and is not affiliated with America Ships.

66.     On July 15, 2021, I navigated to the Nootropicsdepot.com website and used an undercover email address to create an account and order the Unapproved Drugs Nootropics Depot phenibut HCL powder (250 grams) and Nootropics Depot piracetam powder (1 kilogram).  The purchase was paid via undercover credit card.  Upon completion of the purchase, the order number 1259023 was provided.  On July 20, 2021, this purchase was delivered to the undercover address PO Box 802, Salem, NH 03079.  A return address on the package was labeled Order Fulfilment, Nootropics Depot, 8380 S Kyrene Road, Ste 109, Tempe, AZ 85284.

67.     The labels of all these products contain (1) the name of the chemical contained therein, i.e., piracetam, (2) the phrase "Nootropic Compound," and (3) a disclaimer reading "All chemical compounds have risks.  Please read the available research and understand the associated risks before handling.  If you are uncertain of the appropriate handling methods, please consult a qualified professional.  Misuse of the

23

product may result in adverse reactions.  This product is not approved by the FDA."  The labels do not include any directions for use, such as the intended use, dosage information, or the route or method of administration.  The drugs are therefore misbranded because their labeling does not include adequate directions for use as required by the FDCA.  In addition, because these drugs are not generally recognized as safe and effective for their intended uses, and are not approved by the FDA, they are also unapproved new drugs.





68.     Samples of each of the purchased drugs were sent to the FDA Forensic Chemistry Center for analysis.  The lab confirmed that each substance was as labeled.

69.     On August 18, 2021, I emailed support@nootropicsdepot.com utilizing an undercover email address with concerns from my July 15, 2021 undercover purchase.  In the email I wrote "Hi, I am generally happy with my last purchase and intend to purchase more in the future, however; I have noticed a copper taste with the Phenibut and some shakiness shortly after taking it.  Has anyone else reported similar issues?"  Later this same day I received a response asking for the lot number listed on the label of the jar in question.  I forwarded the lot number and on August 24, 2021, I received an email from support@nootropicsdepot.com stating "Thank you so much for your patience while we got back to you.  We understand your concern and will gladly assist you with this.  After

looking into this, we found we have not had any similar reports of issues with this batch. Additionally, this lot passed all testing with no deviations noted by Production or Quality Control.  Unfortunately, not every product works as you may expect it, and we sincerely understand the frustration that can arise from that.  We guarantee that we extensively test our products in the lab before putting them on the shelf.  Not only do we have a state-of-the-art in-house analytical lab, but we partner with many ISO-certified 3rd party labs to ensure all of our products are pure, potent, and free from contaminants.  For more information on our testing, please click the following link, https://nootropicsdepot.com/in-house-lab-testing/.  Please see the Certificate of Analysis for your specific lot attached."

### Markup on Unapproved Drugs

70.     CBP and bank records show that between April 10, 2017 and September 30, 2021, entities controlled by Eftang purchased over $7.4 million of product from known suppliers of Unapproved Drugs.  That amount is broken down by supplier as follows:

| Supplier | Amount |
|---|---|
| Qingdao Sincess/Forcess | $4,183,041 |
| JX Nutritional Chemical Co. | $2,465,562 |
| Shanghai Soyoung | $485,021 |
| Shanghai Norky Pharmaceutical | $348,000 |
| Total | $7,481,624 |

71.     An analysis of CBP records showed that Eftang received, among other things, the following shipments of phenibut over the past few months from known suppliers of Unapproved Drugs:

| Date | Supplier | Quantity (Kg) | Declared Value |
|---|---|---|---|
| 4/4/2021 | Shanghai Norky Pharmaceutical | 1,246 | $44,000 |
| 11/15/2021 | Qingdao Sincess/Forcess | 552 | $50,000 |

72.     Based on the above chart, the price paid to Shanghai Norky Pharmaceutical was $35 per kilogram (3.5 cents per gram) of phenibut.  The price paid to Qingdao Sincess/Forcess was $91 per kilogram (9.1 cents per gram) of phenibut.

73.     By way of comparison, the average price of phenibut paid to Nootropics Depot in the undercover purchases discussed in paragraphs 49 to 69 was $700 per kilogram (70 cents per gram).  This suggests that Nootropics Depot charged a significant markup on the phenibut it was selling to retail customers.

### Surveillance and Coordination with U.S. Postal Service

74.     Between June 14, 2021 and June 16, 2021, U.S. Postal Inspector Kelley McKiernan and I conducted surveillance of the Subject Premises, Nootropics Depot, 8370 and 8380 South Kyrene Road, Tempe, AZ.  The following was noted during the surveillance.

75.     No outdoor surveillance cameras were visible on either building.  Access to the buildings was controlled using card readers.  There were no business markings or advertisement signs located on either building identifying Nootropics Depot as the occupant.

76.     Employees were observed walking back and forth between buildings 8370 (suites 105 and 107) and 8380 (suites 109 and 110).  The employees pushed carts throughout the day containing boxes and plastic tubs that appeared to contain Nootropics

Depot products.  From our position it appeared empty tubs/boxes were pushed from building 8370 to 8380, while full tubs were pushed from 8380 to 8370.

77.     On June 15 and 16, 2021, Inspector McKiernan and I conducted trash pulls from the dumpsters located behind buildings 8370 and 8380.  The dumpster behind 8370 contained a multitude of used nitrate gloves, packaging material and large syringes.  There was a yellow powder throughout the dumpster that covered all the above-mentioned items; photos were taken of those items.  The dumpster located behind 8380 contained multiple empty cardboard drums with labels identifying the contents as piracetam (net weight 25 kilograms) with a manufacture date of November 30, 2020.  Noted on one of the labels was "drum No. 16/49", indicating there were originally 49 drums containing the same product.  The labels identified the product as originating from China.





## **Interviews of Witnesses**

78.    Between June 14 and 16, 2021, United States Postal Inspector Kelley

McKiernan and I interviewed two former employees (Witnesses 1 and 2) and one current

employee (Witness 3) of Nootropics Depot.  Witness 1 worked in the fulfillment group

pulling products from shelves for orders; Witness 2 was a fulfillment supervisor; and

Witness 3 does inventory control.

79.     All three of the witnesses worked or work in building 8370, which they described as the warehouse building.  Building 8370 also contained a "clean room" or laboratory, an area for shipping and receiving, and office space where managers have offices.  Building 8380 was the production area, where raw materials were processed into commercial forms as seen on the Nootropicsdepot.com website.  The substances are containerized and encapsulated, placed into smaller containers, and labeled for sale to the end user.  The finished products were then transferred to building 8370 for packing and shipping.  The witnesses stated hundreds of packages left the warehouse everyday via Federal Express and the U.S. Postal Service.

80.     Witnesses 1 and 2 stated the company received bulk deliveries of raw product from China, Russia, and Florida.  The company also shipped internationally with a large portion going to Mexico.  The Mexico-bound products were stored in a special location within the warehouse while awaiting shipment.  Witness 2 recalled meeting two men from Mexico in 2018 while they toured the facility.  Witness 2 recalled their names were Foco and Max.  Witness 2 recalled speaking French to Max.  Witness 2 believed these two were the parties receiving most of the products shipped to Mexico.

### Lack of FDA Registration as a Drug Manufacturing Establishment

81.     Owners or operators of establishments engaged in the manufacture or repackaging of a drug are required to register annually with the FDA.  Drugs manufactured or repackaged in an establishment not registered with FDA are misbranded.  On October 13, 2021, I conducted a search of FDA's Drug Establishments Current Registration site for the businesses I knew were owned and operated by Eftang.  That

search returned zero results.  I also conducted a search of the FDA site for registration by the three China-based companies listed above in paragraphs 36, 38, and 42.  That search also returned zero results.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

82.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

83.    *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

31

   b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

   d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

84.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can

33

indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic

34

storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual

35

information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

85.   *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above,

36

because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

86.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information

37

consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

87.     Under Eftang' s ownership, Nootropics Depot imports, manufactures, sells, and exports drugs to individual end users in the U.S. and abroad. There is probable cause to believe that the products identified above and in Attachment B are drugs because they are sold as nootropic compounds and therefore are intended to affect the structure or function of the human body. The drugs are not approved by the FDA, do not bear labeling with adequate directions for use, and were manufactured or repackaged in a facility not registered with FDA. Eftang and his companies have created a scheme wherein the raw materials are shipped into the U.S. under false pretenses—i.e., "Research and Development Purposes Only"—but are in fact processed, packaged, and sold for individual use as drugs. Further, Eftang expanded his enterprise by teaming with Maxime Oujevolk. By supplying Oujevolk with misbranded drugs and making Oujevolk an authorized seller of Nootropic Depot and Ceretropic products, Eftang has created an additional commercial avenue to funnel misbranded drugs into the U.S. by way of Mexico and drop shippers located near the Mexican/U.S. border.

88.     Based on the foregoing, I request the Court issue the proposed search warrant. I have probable cause to believe that Nootropics Depot has violated 18 U.S.C. §§ 371, 545, and 1001 and 21 U.S.C. §§ 331(a) and (d).

89.    I also have probable cause to believe that evidence, fruits and instrumentalities of these crimes, as described in Attachment B, are contained within the premises described in Attachment A.

90.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


December 2, 2021
_____
Executed on (Date)

William Hughes, Special Agent
FDA-OCI


___x___ Sworn by telephone

Hon. John Z. Boyle
U.S. Magistrate Judge

39